(Nos. 66929, 66999, 67184 cons.—
THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. R.G., a Minor, *et al.*, Appellees.

*Opinion filed October 25, 1989.*

330

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Terence M. Madsen and Kenneth A. Fedinets, Assistant Attorneys General, of Chicago, of counsel), for the People.

Robert J. Anderson, of Anderson, Deitsch & Associates, P.C., of Wheaton, for appellees R.G. and B.R.

George A. Thomas and Michael F. Konewko, of the Law Offices of George A. Thomas, of Glen Ellyn, for appellee A.R.

JUSTICE CALVO delivered the opinion of the court:

The State filed a petition under the Juvenile Court Act (the Act) (Ill. Rev. Stat. 1987, ch. 37, par. 801—1 *et seq.* (formerly Ill. Rev. Stat. 1985, ch. 37, par. 701—1 *et*

*seq.*)) alleging R.G., a minor, required authoritative intervention (Ill. Rev. Stat. 1987, ch. 37, par. 803—3 (formerly Ill. Rev. Stat. 1985, ch. 37, par. 702—3)), and requesting the circuit court adjudge R.G. a ward of the court. The State filed a similar petition regarding B.R., also a minor. The mother of B.R. filed a motion to dismiss the petition concerning B.R., alleging that the provisions of the Act relating to Minors Requiring Authoritative Intervention (the MRAI) (Ill. Rev. Stat. 1987, ch. 37, par. 803—1 *et seq.*) were unconstitutional. The circuit court of Du Page County found the MRAI violative of substantive and procedural due process, and equal protection provisions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2); therefore, it held the MRAI unconstitutional and allowed the motion to dismiss. On its own motion, the circuit court also dismissed the petition concerning R.G. for the same reason. The State directly appealed both decisions to this court. (107 Ill. 2d Rules 660(b), 302(a).) We consolidated the cases for review. On appeal, the State and the minors ask us to reverse the decision of the circuit court, while B.R.'s mother asks us to affirm the decision of the circuit court. Because we uphold the constitutionality of the MRAI, we reverse the decision of the circuit court.

## I. Provisions of the MRAI

A minor requiring authoritative intervention is defined as follows:

"[A]ny minor under 18 years of age (1) who is (a) absent from home without consent of parent, guardian or custodian, or (b) beyond the control of his or her parent, guardian or custodian, in circumstances which constitute a substantial or immediate danger to the minor's physical safety; and (2) who, after being taken into limited custody for the period provided for in this Section and offered interim crisis intervention services, where available,

refuses to return home after the minor and his or her parent, guardian or custodian cannot agree to an arrangement for an alternative voluntary residential placement or to the continuation of such placement. Any minor taken into limited custody for the reasons specified in this Section may not be adjudicated a minor requiring authoritative intervention until the following number of days have elapsed from his or her having been taken into limited custody: 21 days for the first instance of being taken into limited custody and 5 days for the second, third, or fourth instances of being taken into limited custody." (Ill. Rev. Stat. 1987, ch. 37, par. 803—3.)

If a law enforcement officer takes a minor into limited custody for a fifth or subsequent instance, the circuit court may immediately adjudicate the minor as one requiring authoritative intervention without offering the minor crisis intervention services or alternative placement. (Ill. Rev. Stat. 1987, ch. 37, par. 803—3.) If one year has elapsed since the last instance of the State's taking the minor into limited custody, the State must again afford the minor the 21-day period. Ill. Rev. Stat. 1987, ch. 37, par. 803—3.

An officer may take a minor into "limited custody" if the officer reasonably believes the minor is one requiring authoritative intervention. (Ill. Rev. Stat. 1987, ch. 37, par. 803—4(a) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 703—1.1(a)).) The officer must notify the parents of the minor's whereabouts, and inform the minor of the reasons why the officer took the minor into custody. (Ill. Rev. Stat. 1987, ch. 37, par. 803—4(b) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 703—1.1(b)).) If the minor wishes to return to his or her parents, the officer must arrange for the minor's transportation. (Ill. Rev. Stat. 1987, ch. 37, par. 803—4(c) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 703—1.1(c)).) If the officer cannot contact the minor's parents, the minor refuses to return to his or her parents, or the officer cannot otherwise arrange for the

safe release of the minor, the officer must arrange to take the minor to an agency or association which provides interim crisis intervention services. Ill. Rev. Stat. 1987, ch. 37, par. 803—4(d) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 703—1.1(d)).

An agency or association may provide interim crisis intervention services to a minor if a police officer takes the minor into limited custody, if the minor requests such services, or if the minor is referred for assistance. (Ill. Rev. Stat. 1987, ch. 37, par. 803—5(a) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 703—3.1(a)).) In order to provide crisis intervention services, the agency or association must "immediately investigate the circumstances of the minor and the facts surrounding the minor being taken into custody and promptly explain these facts and circumstances to the minor." (Ill. Rev. Stat. 1987, ch. 37, par. 803—5(a)(i) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 703—3.1(a)(i)).) The agency or association must also notify the minor's parents of the minor's whereabouts. (Ill. Rev. Stat. 1987, ch. 37, par. 803—5(a)(ii) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 703—3.1(a)(ii)).) The agency or association may refer the minor and/or parents to medical, psychological, psychiatric or social services. (Ill. Rev. Stat. 1987, ch. 37, par. 803—5(a).) If the minor consents, the agency or association must arrange to release the minor to his or her parents. Ill. Rev. Stat. 1987, ch. 37, par. 803—5(a)(iii) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 703—3.1(a)(iii)).

If the agency or association cannot contact the minor's parents, or the minor refuses to return home, or the agency or association cannot otherwise arrange for the minor's return home, then the agency or association may place the minor in a temporary living arrangement. (Ill. Rev. Stat. 1987, ch. 37, par. 803—5(a).) A temporary living arrangement includes a foster family home, group home or the residence of any person agreed to by the

minor's parents and the agency or association. (Ill. Rev. Stat. 1987, ch. 37, par. 803—5(b); Ill. Rev. Stat. 1987, ch. 23, par. 2211 *et seq.*) An agency or association may shelter a minor in a temporary living arrangement only if it "seeks to effect the minor's return home or alternative living arrangements agreeable to the minor and the parent *** as soon as practicable." (Ill. Rev. Stat. 1987, ch. 37, par. 803—5(b) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 703—3.1(b)).) An agency or association cannot shelter a minor in a temporary living arrangement for more than 48 hours without parental consent unless the agency or association cannot contact the minor's parents. (Ill. Rev. Stat. 1987, ch. 37, par. 803—5(b).) Under these circumstances, the agency or association cannot shelter the minor for more than 21 days and it must document its unsuccessful efforts to contact the parents. Ill. Rev. Stat. 1987, ch. 37, par. 803—5(b).

The minor and the minor's parents may agree, at any time after the State takes the minor into custody, to alternative voluntary residential placement of the minor without a court order. (Ill. Rev. Stat. 1987, ch. 37, par. 803—6(a) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 703—9(a)).) Alternative placement involves placing the minor in a foster family home or group home. (Ill. Rev. Stat. 1987, ch. 37, par. 803—6(a); Ill. Rev. Stat. 1987, ch. 23, par. 2211 *et seq.*) Unlike a temporary living arrangement, alternative placement only occurs if the minor and the minor's parents agree to such placement. If the minor and the minor's parents cannot agree to alternative placement, and the minor refuses to return home, then the minor, a person acting on behalf of the minor, or the minor's parents may file a petition alleging that the minor requires authoritative intervention. Ill. Rev. Stat. 1987, ch. 37, par. 803—6(b) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 703—9(b)).

## II. History of the MRAI

The MRAI, through section 3—3 of the Act (Ill. Rev. Stat. 1987, ch. 37, par. 803—3), replaced section 2—3 of the Act, entitled Minors Otherwise in Need of Supervision (MINS) (Ill. Rev. Stat. 1981, ch. 37, par. 702—3). The MINS provided:

> "Those otherwise in need of supervision include (a) *any minor under 18 years of age who is beyond the control of his parents, guardian or other custodian*; (b) any minor subject to compulsory school attendance who is habitually truant from school; (c) any minor who is an addict \*\*\*; and (d) \*\*\* any minor who violates a lawful court order made under this Act." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 37, par. 702—3.)

While the MINS applied to minors beyond the control of their parents, the MRAI applies not only to minors beyond parental control (Ill. Rev. Stat. 1987, ch. 37, par. 803—3(1)(b)), but also to minors absent from home without parental consent (Ill. Rev. Stat. 1987, ch. 37, par. 803—3(1)(a)). Under the MINS, therefore, the State had to prove that a runaway minor was beyond parental control before the State could intervene. For a runaway minor to come under the MRAI, the State must prove that the minor is either beyond parental control *or* absent from home without parental consent. On the other hand, both the MINS and the MRAI, through the beyond-parental-control provisions, apply to minors who are not runaways or absent from home, but who are nevertheless beyond the control of their parents.

## III. Ambiguity in the MRAI

Before we review the constitutionality of the MRAI, we must first resolve an ambiguity in section 3—3(1). The ambiguity is whether the phrase "in circumstances which constitute a substantial or immediate danger to

the minor's physical safety" (the "immediate danger" phrase) modifies both subsection (a), which applies to minors absent from home without parental consent, and subsection (b), which applies to minors beyond parental control, or only subsection (b). The interpretation of section 3—3(1) is important because it affects some of the constitutional issues addressed later.

The circuit court, as well as B.R.'s mother and the State, interpreted section 3—3(1) such that the "immediate danger" phrase did not modify subsection (a). The minors in the case at bar, however, point out that the appellate court in *In re J.M.* (1988), 170 Ill. App. 3d 552, 559-60, found that the "immediate danger" phrase modifies both subsections (a) and (b). Nevertheless, we conclude that the "immediate danger" phrase does *not* modify subsection (a). We can uphold the constitutionality of section 3—3(1)(a) even without the modification. Before we dispose of this issue, however, we must discuss the reasoning of the *J.M.* court.

The *J.M.* court based its decision on *In re Polovchak* (1983), 97 Ill. 2d 212, and the legislative history of the MRAI. The *J.M.* court concluded:

> "[I]t is clear that minors to whom the MRAI statute would be applicable are those whose behavior is the same type of behavior which was found to require supervision under the MINS statute [citation], *i.e.*, as noted *** in *Polovchak*, supervision was predicated on the fact the minor was incorrigible, a frequent runaway, or that the minor's acts posed serious hazards to himself or to others." (*J.M.*, 170 Ill. App. 3d at 560-61.)

The *J.M.* court found that in order for the MRAI to apply to the same type of behavior as the MINS, the "immediate danger" phrase had to modify subsection (a).

The *Polovchak* decision involved the MINS. In *Polovchak*, Michael and Anna Polovchak and their children, including their son, 12-year-old Walter, moved to Illinois

from the Ukraine. Michael and Anna decided to return
to the Ukraine but Walter did not want to leave the
United States. Walter's parents did not want him to stay
in the United States without them. Walter and his sister,
without their parents' consent, moved in with their
cousin for several days. Michael reported Walter's disap-
pearance to the police. The police located Walter and
called the Federal authorities regarding Walter's request
to stay in the United States. The circuit court later ad-
judged Walter a ward of the court after finding him to
be a minor in need of supervision. The circuit court de-
nied Michael and Anna's request to have Walter re-
turned to them.

This court disagreed with the ruling of the circuit
court:

> "While this court has not previously construed the
> phrase 'beyond the control' of one's parents, *** it seems
> manifest that the legislature could not have intended that
> phrase to include an isolated act by a 12-year-old minor
> which poses no hazard to him or anyone else. Decisions in
> this court, while involving different issues, demonstrate
> that the initial determination that the minor was in need
> of supervision was predicated on the fact that he was in-
> corrigible, a frequent runaway or his acts posed serious
> hazards to himself or others. [Citations.]
>
> *** Neither psychiatrist, testifying in response to hy-
> pothetical questions based on these and other relevant
> facts, believed that Walter was beyond the control of his
> parents. *** Walter's actions, which can hardly be char-
> acterized as those of a runaway, and posed no hazard to
> himself or anyone else, simply do not establish that he
> was beyond parental control." (*Polovchak*, 97 Ill. 2d at
> 224-26.)

The *Polovchak* court also pointed out that Walter never
stated "he would not remain with his parents if re-
leased." (*Polovchak*, 97 Ill. 2d at 223.) Moreover, this
court noted that Walter's reluctance to return home did

not originate "from his opposition to being reunited with his parents but rather from his desire not to return to the Ukraine, an unlikely possibility, had the court released him to his parents, in view of the interest manifested by the Federal agencies." (*Polovchak*, 97 Ill. 2d at 224.) For all of these reasons, the court in *Polovchak* held that Walter was not beyond the control of his parents and thus not in need of supervision.

Our decision in the case at bar in no way conflicts with *Polovchak*. *Polovchak* only concerned whether a particular minor was beyond the control of his parents under the MINS. Under the MRAI, *Polovchak* would apply to section 3—3(1)(b) rather than section 3—3(1)(a). We conclude, therefore, that *Polovchak* does not mandate the interpretation of section 3—3(1) asserted by the *J.M.* court.

The *J.M.* court also based its interpretation of section 3—3(1) on its finding that the legislature intended the MRAI to cover the same type of behavior covered by the MINS. The *J.M.* court pointed to the following exchange during the debate on the MRAI in the Illinois House of Representatives:

"[Representative] Kulas: Representative Grossi, Senate Bill 623 abolishes the category of minors known as minors in need of supervision, and it replaces this category with a second category called a minor requiring authoritative intervention. Could you explain the difference between the two categories to me?

[Representative] Grossi: My understanding [is] that it is simply a change in the description of these types of minors.

[Representative] Kulas: There is no difference, as far as factual differences? Is it just a name change, in other words?

[Representative] Grossi: What is described [is] the same type of behavior, instead of identifying them as minors in need of supervision, they are now known as mi-

nors in need of authoritative intervention, and there's the addition of twenty-one days before they are brought before the court." 82d Ill. Gen. Assem., House Proceedings, June 25, 1982, at 158.

Our interpretation of the MRAI is not inconsistent with the substance of the House debate reiterated above. Even when section 3—3(1)(a) is interpreted as not requiring any proof of "immediate danger" to the minor, the MRAI and the MINS still apply to the same type of behavior; that is, both statutes apply to runaway minors. The MINS and the MRAI, however, are not exactly alike. The MINS only applied to minors beyond the control of their parents. The MRAI, however, not only applies to minors beyond the control of their parents, but also to minors absent from home without parental consent. If the legislature had intended the MRAI to cover exactly the same conduct as the MINS, the legislature would not have included the absentee category in the MRAI. In fact, section 1—4 of the Act reveals that the legislature intended to cover a broader range of activity under the MRAI:

"Nothing in this Act shall be construed to give *** any court jurisdiction *** over any minor solely on the basis of the minor's (i) misbehavior which does not violate any federal or state law or municipal ordinance, (ii) refusal to obey the orders or directions of a parent, guardian or custodian, (iii) absence from home without the consent of his or her parent, guardian or custodian, or (iv) truancy, until efforts and procedures to address and resolve such actions by a law enforcement officer during a period of limited custody, by crisis intervention services *** and by alternative voluntary residential placement *** have been exhausted without correcting such actions." (Ill. Rev. Stat. 1987, ch. 37, par. 801—4(b) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 701—19(b)).)

Consequently, while we agree with the decision in *J.M.* upholding the constitutionality of the MRAI, we overrule

that portion of the decision which interpreted the "immediate danger" phrase as modifying section 3—3(1)(a).

## IV. Substantive Due Process

Under substantive due process (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2), a statute is unconstitutional if it impermissibly restricts a person's life, liberty or property interest. (*Kelley v. Johnson* (1976), 425 U.S. 238, 244, 47 L. Ed. 2d 708, 713, 96 S. Ct. 1440, 1444.) Procedural due process, on the other hand, addresses the constitutionality of the specific procedures employed in the statute. (*Kelley*, 425 U.S. at 244, 47 L. Ed. 2d at 713, 96 S. Ct. at 1444.) If the life, liberty or property interest is a fundamental right, then any statute limiting that right "may be justified only by a 'compelling state interest,' [citations] and *** must be narrowly drawn to express only the legitimate state interests at stake." (*Roe v. Wade* (1973), 410 U.S. 113, 155, 35 L. Ed. 2d 147, 178, 93 S. Ct. 705, 727-28.) If the interest is not a fundamental right, then the statute need only have a rational relation to the purpose the legislature sought to accomplish by enacting the statute. See *Kelley*, 425 U.S. at 244, 247-48, 47 L. Ed. 2d at 713, 715-16, 96 S. Ct. at 1444, 1445-46.

The circuit court correctly concluded that parents have a liberty interest in bearing and raising their children.

> "The [Supreme] Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed 'essential,' *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), 'basic civil rights of man,' *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942), and '[r]ights far more precious *** than property rights,' *May v. Anderson*, 345 U.S. 528, 533 (1953). 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can

neither supply nor hinder.' *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, *Meyer v. Nebraska, supra,* at 399, \*\*\*." *Stanley v. Illinois* (1972), 405 U.S. 645, 651, 31 L. Ed. 2d 551, 558-59, 92 S. Ct. 1208, 1212-13.

See *Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary* (1925), 268 U.S. 510, 534-35, 69 L. Ed. 1070, 1078, 45 S. Ct. 571, 573.

The Supreme Court has further held that an individual's freedom of choice concerning procreation, marriage and family life is a fundamental right. Thus, statutes restricting that right may only survive if a compelling State interest exists. *Moore v. City of East Cleveland* (1977), 431 U.S. 494, 498-99, 52 L. Ed. 2d 531, 536-37, 97 S. Ct. 1932, 1934-35; *Roe*, 410 U.S. at 152-55, 35 L. Ed. 2d at 176-78, 93 S. Ct. at 726-28; *Zablocki v. Redhail* (1978), 434 U.S. 374, 383-88, 54 L. Ed. 2d 618, 628-31, 98 S. Ct. 673, 679-82; see *Griswold v. Connecticut* (1965), 381 U.S. 479, 502-04, 14 L. Ed. 2d 510, 525-27, 85 S. Ct. 1678, 1691-92 (White, J., concurring); *Harrah Independent School District v. Martin* (1979), 440 U.S. 194, 198, 59 L. Ed. 2d 248, 254, 99 S. Ct. 1062, 1064.

The State contends that even if a statute impinges upon a fundamental right, a court must use the rational relationship standard of review unless the statute "significantly interferes" with the fundamental right. (*Zablocki*, 434 U.S. at 386-88, 54 L. Ed. 2d at 630-31, 98 S. Ct. at 681-82.) Only statutes which significantly interfere with fundamental rights are subject to strict scrutiny. (*Zablocki*, 434 U.S. at 386-88, 54 L. Ed. 2d at 630-31, 98 S. Ct. at 681-82.) The State argues that the MRAI does not inhibit or alter parents' temporary or permanent custody of their children, so the MRAI does not significantly interfere with the parents' fundamental right.

Under the MRAI, if the State takes a minor into limited custody and the minor refuses to return home, the State, during the first 21 days, must refuse any demand made by the parents to return the child home. The MRAI, therefore, necessarily affects the fundamental right of the parents of a runaway minor to control over their family. Although the State neither takes the minor out of the home nor alters the parents' temporary or permanent custody of the minor, the State nevertheless intercedes, on behalf of the minor, in the family relationship. Thus, the MRAI significantly interferes with the family relationship and can only be justified if the State has a compelling interest.

The circuit court, as well as all of the parties, agreed that the State has a compelling interest in protecting the welfare of children. Indeed, the Supreme Court has held that the State has a legitimate interest in the welfare and protection of juveniles. (*Ginsberg v. New York* (1968), 390 U.S. 629, 638-41, 20 L. Ed. 2d 195, 203-05, 88 S. Ct. 1274, 1279-81; *Stanley*, 405 U.S. at 652, 31 L. Ed. 2d at 559, 92 S. Ct. at 1213; *Santosky v. Kramer* (1982), 455 U.S. 745, 766, 71 L. Ed. 2d 599, 615, 102 S. Ct. 1388, 1401; *Parham v. J.R.* (1979), 442 U.S. 584, 603, 61 L. Ed. 2d 101, 119, 99 S. Ct. 2493, 2504-05; *Prince v. Massachusetts* (1944), 321 U.S. 158, 166, 88 L. Ed. 645, 652-53, 64 S. Ct. 438, 442.) "Acting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control ***." (*Prince*, 321 U.S. at 166, 88 L. Ed. at 652, 64 S. Ct. at 442.) The circuit court, however, held that the State's asserted compelling interest in the welfare of minors does not justify the MRAI. The circuit court also held that even if the State has a legitimate compelling interest which justifies the MRAI, the MRAI is not narrowly tailored to effectuate that interest.

The primary objection of the circuit court to the MRAI concerned section 3—3(1)(a). The circuit court did not discuss the constitutionality of section 3—3(1)(b). Because the circuit court did not rule on section 3—3(1)(b), we decline to review that section. See *Christopher v. West* (1951), 409 Ill. 131, 134-35.

The circuit court found that because section 3—3(1)(a) does not provide for an individual assessment of the risk of harm to a minor, the State presumes that all minors absent from home without parental consent are at risk of harm. The circuit court reasoned:

"That some runaway children can and do face risk of physical harm is indisputable. Certainly, the State advances a compelling interest when it removes such a runaway child from danger. \*\*\*

Even so, I agree with the Parent that the State cannot rest on the sweeping assertion that its interest in the physical safety of runaway children is compelling. \*\*\*

\* \* \*

\*\*\* Not all absentee children are runaways. They do not all face a risk of harm, and indeed, the statutory scheme makes no allowance for an assessment of risk to the child. Absent such a risk assessment, the State acts blindly. \*\*\*

\* \* \*

The Respondents' asserted justification presumes that the Child necessarily is a street urchin or is otherwise residing with society's more unsavory characters. Under MRAI, however, absence from 'home' is the sole criterion. No consideration is given to the nature and quality of the Child's non-home living conditions, nor does the MRAI scheme permit such consideration. For example, MRAI makes no provision for the child who lives in the safe and secure family home of a grandparent, sibling, other relative, or friend. MRAI applies equally to *all* children, whether or not they are at risk. This lays bare the Respondents' assertion that 'safety' of

the Child is their paramount concern." (Emphasis in original.)

The circuit court determined that the State could not assert a compelling interest in the welfare of minors or justify the breadth of the MRAI unless the State proved that a risk of harm existed for each minor brought under the MRAI.

We disagree with the circuit court. When a minor detaches himself or herself from parental authority by running away from home, the minor jeopardizes his or her welfare. The minor must find money, food and shelter, not to mention adult guidance, schooling, and médical care, among other things. Even if the minor finds refuge with a relative or friend, the minor's welfare could still be in jeopardy because the minor may not be receiving proper care there.

The circuit court and B.R.'s mother also object to the MRAI because it does not allow the minor to be returned to the parents during the 21-day period. Contrary to the circuit court's conclusion, the State can quite properly assume that a minor who runs away from home and refuses to return home would run away again if forced to return home. The minor's best interests would not be served by returning the minor home because the State would be placing the minor in an environment where the risk is great that he or she would return to the streets. Even if the minor were to find proper shelter with a relative or friend, returning the minor home would put the minor at risk of harm because the minor may not only run away from home again, but also may avoid the shelter of the relative or friend so as not to be found. By providing refuge for the minor for 21 days, the State can attempt to reconcile the family and thus avoid taking the risk that the minor will run away again. The State serves the minor's best interests by stabilizing the minor's environment, preventing the minor from

running further and attempting to effectuate the minor's voluntary return home. Moreover, if the minor ever desires to return home, the State must take the minor home.

According to the circuit court, because foster homes and State shelters are often more restrictive than the minor's home environment, and no natural bond of affection exists between the minor and such shelters, the risk that the minor will run away from alternative placement is great. If the minor runs away from alternative placement, the circuit court contended, the minor will then try to avoid both the State and his or her parents, so the chance increases that the minor will be on the streets.

The circuit court's assumptions may be true in some, but not all cases. The legislature could have made other quite proper and plausible assumptions. For example, only if a minor agrees to alternative placement does such placement occur. So, although a minor may run from alternative placement, that risk may not be great. Even if the court orders placement of the minor outside the home, the minor has already run from home, so he or she may be more likely to run from home again. In addition, because parents of a runaway child usually report their missing child to the police, the child may have tried to avoid the State, as well as his or her parents, from the time he or she ran away from home. Thus, the child is not necessarily more likely to be on the streets if he or she runs from alternative placement than if he or she runs from home.

The circuit court asserted that under section 3—3(1)(a), the State presumes facts which it must prove under section 3—3(1)(b). That is, under the absentee provision, the State presumes that the minor is beyond the control of his or her parents and in substantial harm. The circuit court viewed the absentee provision as a way to circumvent section 3—3(1)(b). For the reasons we

have just enumerated, the presumptions the State makes under section 3—3(1)(a) are justified. Section 3—3(1)(b) serves a separate purpose from section 3—3(1)(a). Section 3—3(1)(b) applies to minors who have not necessarily run away from home, but who are beyond the control of their parents and have put themselves in danger. The circuit court pointed to *Polovchak* as an example of why not all absentee minors are runaways. As we noted earlier, however, *Polovchak* concerned the MINS and whether a minor was beyond the control of his parents, so *Polovchak* is inapplicable.

The circuit court determined that the MRAI effectively protects the minor's right to refuse to return home. According to the circuit court, the minor, because of his or her age, is not mature enough to make this decision. (*Bellotti v. Baird* (1979), 443 U.S. 622, 634, 61 L. Ed. 2d 797, 807, 99 S. Ct. 3035, 3043; see *Parham*, 442 U.S. at 602-03, 61 L. Ed. 2d at 118-19, 99 S. Ct. at 2504.) The circuit court asserted that parents are entitled to laws to help them discharge their responsibilities. *Ginsberg*, 390 U.S. at 639, 20 L. Ed. 2d at 203-04, 88 S. Ct. at 1280.

As we noted earlier, instead of returning the minor home and taking the risk that the minor will run away again, the State may give refuge to the minor and seek to resolve the problem. The State does not elevate the minor's wants over the parents' rights. Rather, through the MRAI, the State deals practically with a situation created by the minor and the parents. The State does not sanction the minor's decision, because after the 21-day period the court could order the minor to return home or place the minor in a residence outside the home without the minor's approval. Ill. Rev. Stat. 1987, ch. 37, par. 803—24(1)(a) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 705—2(1)(b)).

The circuit court contended further that the MRAI wrongly pits the minor against his or her parents as if the two interests are opposed. (See *Santosky*, 455 U.S. at 760, 71 L. Ed. 2d at 611, 102 S. Ct. at 1390.) When the State intervenes, however, the minor and the parents are already pitted against one another. Moreover, the State does not presume the minor's and the parents' interests are opposed, because during the 21-day period the State attempts to reconcile the family.

The circuit court also determined that the MRAI would deter parents from reporting a missing child because parents would fear that the State would intervene and take the child. We doubt that the MRAI would have this effect. Parents who do not know the whereabouts of their child are primarily interested in finding the child and seeing to the child's welfare. Having the State help locate the child multiplies the chance someone will find the child. In addition, the MRAI adequately protects the parents' rights so the parents' risk that they will not retain custody of their child is slight.

The circuit court concluded that the MRAI, by obstructing parental authority over the minor, increased the risk of future delinquency by the minor because the minor may have escaped reasonable parental regulations. The MRAI, however, helps prevent runaway minors from becoming delinquents. The State, by providing shelter and protection to minors, takes minors off the streets and prevents them from resorting to illegal activities in order to acquire money, shelter and food. The runaway minor has, by himself or herself, already thwarted the parents' authority. The State only provides a haven for the minor for a short period of time and attempts, during that time, and if it is in the minor's best interest, to restore parental authority by encouraging the minor to return home.

The circuit court also pointed out that, under the MRAI, as the number of times a minor runs away increases, the number of days before the initial hearing decreases. The circuit court contended that those parents most likely to have lost control of their child, as evidenced by their child's running away more than once during a year, get a prompt hearing. The MRAI deprives parents of first-time runaways, those parents most likely to regain control of their children, of the opportunity to exercise authority over their children.

As we noted earlier, the State through the MRAI does not thwart the parents' authority. The MRAI hearing scheme serves three purposes. First, during the 21-day period the State attempts to reconcile the minor and his or her parents. (Ill. Rev. Stat. 1987, ch. 37, par. 803—5(b).) Second, if the minor runs away more than once, then the State's initial intervention did not succeed, so it would be futile to attempt it, at length, again. Third, the MRAI, by not providing the 21-day period to a minor every time he or she runs away, does not encourage minors to run away every time they get into an altercation with their parents.

In fact, the circuit court concluded that the MRAI could cause some minors to leave home because those who would not otherwise have the self-assurance or motivation to run away could do so, with the State providing a safe retreat. Consequently, minors could use the threat of safely running away as a tool to manipulate their parents. As we just noted, the 21-day period is only provided once; this curbs the chance of recidivism. Moreover, although a State shelter is adequate to provide protection and care for minors, we are not afraid that minors will run away from home because the State's shelter program is fun.

A New York family court upheld the constitutionality of New York's Runaway and Homeless Youth Act (Youth

Act) in *In re Curran* (N.Y. Fam. 1985), 128 Misc. 2d 306, 488 N.Y.S.2d 983. The Youth Act authorizes a minor who is absent from home without parental consent to stay in a State runaway program on a voluntary basis for 30 days. (N.Y. Exec. Law §§532—a(1), 532—b(2) (McKinney 1982).) The minor's parents cannot contest the minor's residence with the program during the 30 days. (*Curran*, 128 Misc. 2d at 307, 488 N.Y.S.2d at 984.) The *Curran* court stated:

"A child's running away from home must be considered an extraordinary circumstance which both justifies and requires the State to intervene to protect the interests of the child.

\* \* \*

\*\*\* [T]he [Youth] Act does not authorize the State to remove a child from a parent. The [Youth] Act merely authorizes the State to provide a program in which the child may temporarily seek shelter and assistance. The child is neither removed nor detained by the program, since it is the child who has sought refuge in the program, [from] which he is free to leave upon his request unless a court order has been entered.

\* \* \*

The Legislature has sought to provide a temporary solution to the immediate problems faced by runaway children. The Legislature's findings and purposes are set forth as follows:

'\*\*\* The legislature hereby finds and declares that juveniles are running away from home at alarming rates. Runaway youth are without protection and the ordinary means of support, exposed to unnecessary danger and become victims of various illicit businesses which prey upon their vulnerability. This [Youth] act is designed to establish procedures and services to help protect runaway youth and to alleviate the personal or family situations which present a threat to the health or safety of the youth or the family.

'The legislature recognizes that when a youth runs away from home, it is symptomatic of some underlying

personal or family conflict. The policy of this state is to provide assistance to such persons and to protect and preserve families. The legislature further recognizes, that because of their age and situation, runaway youth are urgently in need of temporary shelter and counselling services. Therefore, it is not only the purpose of this [Youth] act to reunite youth and their parents, but also to provide appropriate services to help runaway youth cope with their problems.' [Citation.]

Even assuming that the child had run away from home merely to escape reasonable parental control, the child's right to remain in the program will expire after 30 days. However, if it is determined that the child's running was symptomatic of some more pressing problem, the program may file appropriate petitions in Family Court ***.

· This court recognizes that when a child runs away from home and seeks refuge in a program created under the auspices of the [Youth] Act, the parent will be temporarily without the custody of the child without a judicial determination of any kind. However, we emphasize that it is not the State which is either removing or detaining the child. Rather, the State is merely providing temporary refuge for the child who has left the parent's home without their consent.

This court cannot close its eyes to what frequently happens to those youths who have run away from home. If a child has run away, whether or not for just cause, that child will seek refuge somewhere. It is essential that there exists a government approved alternative to the streets.

The court and the State would be shunning their responsibilities to these children if they were told they could not seek refuge in a State sanctioned program until a judicial determination was made authorizing such placement." (*Curran,* 128 Misc. 2d at 310-12, 488 N.Y.S.2d at 986-88.)

Alaska also has similar legislation which allows the State to shelter a minor absent from home without consent for 45 days. (Alaska Stat. §47.10.320 (Supp. 1988).) Alaska

has not yet passed on the constitutionality of this law. Nevertheless, both New York and Alaska have approaches to the runaway-youth problem similar to the approach taken in Illinois.

All of the parties in the case at bar discuss *In re Juvenile Appeal* (1983), 189 Conn. 276, 455 A.2d 1313; *In re Petition of Department of Social Services* (1984), 392 Mass. 696, 467 N.E.2d 861; *In re Sabrina M.* (Me. 1983), 460 A.2d 1009; *In re A.D.* (1983), 143 Vt. 432, 467 A.2d 121; *Lehman v. Stephens* (1986), 148 Ill. App. 3d 538; and *Alsager v. District Court* (S.D. Iowa 1975), 406 F. Supp. 10. Likewise, the circuit court principally relied on *Stanley*, 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208, and *Santosky*, 455 U.S. 745, 71 L. Ed. 2d 599, 102 S. Ct. 1388. These cases support the general constitutional principles we cited earlier, but the cases are factually distinguishable because they involve issues of abuse or neglect, or the removal of temporary or permanent custody of the minors from the parents. Consequently, we need not discuss these cases.

Because the State has a legitimate interest in the welfare of minors and because such welfare is jeopardized when a minor is absent from home without parental consent, the State has a compelling interest to intercede on behalf of the minor. Moreover, for the reasons we have enumerated, the MRAI is narrowly tailored to achieve the State's purpose of protecting the welfare of minors. The MRAI, consequently, does not violate substantive due process.

## V. Procedural Due Process

We also conclude that the MRAI does not violate procedural due process (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2). "The fundamental requirement of [procedural] due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' "

(*Mathews v. Eldridge* (1976), 424 U.S. 319, 333, 47 L. Ed. 2d 18, 32, 96 S. Ct. 893, 902.) " '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' " (*Mathews*, 424 U.S. at 334, 47 L. Ed. 2d at 33, 96 S. Ct. at 902.) Under *Mathews*, a court must consider and balance three factors in determining whether the procedures provided are constitutionally sufficient: (1) the private interest affected by the State action; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) the governmental interest, including the function involved, and the fiscal and administrative burdens imposed by the requirement of additional procedures. *Mathews*, 424 U.S. at 335, 47 L. Ed. 2d at 33, 96 S. Ct. at 903.

The private interest in the case at bar is the parents' fundamental right to family integrity, to the care, custody and control of their child. The crucial question is to what extent the procedures in the MRAI create a risk of erroneous deprivation of the parents' right. The risk of erroneous deprivation of the parents' interest must then be balanced against the probable value additional procedures would provide. The minor also has a private interest in his or her own well-being and in a stable environment. (See *Juvenile Appeal*, 189 Conn. at 286-87, 455 A.2d at 1319.) This interest corresponds with the governmental or State interest in the welfare of minors which we will discuss shortly.

The circuit court found five deficiencies in the MRAI. The primary objection of the circuit court, as well as B.R.'s mother, to the MRAI is the 21-day period before the hearing. B.R.'s mother argues that the hearing should be held within 48 hours of the State's taking custody of the minor. (Under the MINS, a hearing was held within 48 hours of the State's taking custody of the mi-

nor (Ill. Rev. Stat. 1981, ch. 37, par. 703—5(2)).) The circuit court noted that when a parent demands that the State return the minor home, such demand is denied at the outset without a hearing.

Contrary to the argument of B.R.'s mother and the circuit court, the 21-day period does not risk erroneous deprivation of the parents' rights. During the 21-day period, the State must immediately notify the parents of the minor's status and whereabouts, provide crisis intervention services (including a temporary shelter), seek alternative voluntary placement, and attempt to effect the minor's return home. The parents are involved in all of these procedures. The legislature did not institute the 21-day period arbitrarily. The 21-day period gives the State an opportunity to resolve the minor's problem without court intervention and with the cooperation of both the minor and the parents. The 21-day period is sufficiently short so that the parents are not denied custody and control over their child for very long. The potential for erroneous deprivation is, therefore, slim.

The probable value of an immediate court hearing is, on the other hand, very slight. While automatic State intervention during the 21-day period may tend to pit the minor against the parents, requiring an immediate court hearing and disposition does nothing to reduce the confrontational aspect of the situation. As a result of a hearing, the court alone would resolve the problem, and the resolution may be distasteful to the parents, the minor, or both. Consequently, the risk that the minor will run away again is high. The State's attempts, through the MRAI, to resolve the parent-child conflict before the court intervenes reduces this risk.

B.R.'s mother contends that the State cannot compel the minor and the parents to participate in crisis intervention services, and that an early hearing avoids harm to the parents and the minor when such services do not

succeed. Although crisis intervention services require some cooperation between the parents and the minor, the services are not discretionary. The State *must* at least *offer* the services. The State has 21 days to try to make the services work. Then, if crisis intervention fails, a hearing is held. The legislature could properly conclude that an earlier hearing would not allow the State enough time to provide the services.

B.R.'s mother also argues that an earlier hearing would protect the minor if it is in the minor's best interests for him or her to return home immediately. The minor, however, has already voluntarily run away from home and refuses to return home. The legislature could conclude that a period of 21 days, during which the State attempts to reconcile the family, would serve the best interests of the minor because returning the minor home immediately would only create a greater risk that the minor would run away again.

The circuit court's second objection was that the MRAI lessened the State's burden of proof because section 3–3(1)(a) does not require the State to show at the hearing that the minor was at risk of harm and beyond the control of his or her parents, and because the parents' only input is whether they consented to the minor's absence. In order to prove that a minor is one requiring authoritative intervention, however, the State not only has to show that the minor was absent from home without parental consent, it also has to show that it sought to effect the minor's return home, that it offered the minor crisis intervention services, that the 21-day period expired, that the parent and minor could not agree on an alternative placement and that the minor refused to return home. Once a hearing is held and the court determines that the minor requires authoritative intervention, the minor is not automatically adjudged a ward of the court. Rather, a dispositional hearing is held during

which the court determines whether it is in the best interests of the minor and the public that the court adjudge the minor a ward of the court. (Ill. Rev. Stat. 1987, ch. 37, par. 803—22(2) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 704—8(2)); Ill. Rev. Stat. 1987, ch. 37, par. 803—23(1) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 705—1(1)).) During this hearing, the parents are given access to all of the various reports submitted to and considered by the court, and are afforded an opportunity to refute any information in the reports. (Ill. Rev. Stat. 1987, ch. 37, par. 803—23(2) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 705—1(2)).) If the court determines that it is not in the minor's or the public's interest that the minor be adjudged a ward of the court, the minor is released to his or her parents' custody.

Even if the court adjudges the minor a ward of the court, the court may still release the minor to his or her parents and place the minor under supervision. (Ill. Rev. Stat. 1987, ch. 37, par. 803—24(1)(a)(2).) Other dispositions include placing the minor with the Department of Children and Family Services (Ill. Rev. Stat. 1987, ch. 37, par. 803—24(1)(a)(1)), placing the minor with a relative or other person (Ill. Rev. Stat. 1987, ch. 37, par. 803—28(1) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 705—7(1)), ordering the minor emancipated (Ill. Rev. Stat. 1987, ch. 37, par. 803—24(1)(a)(4)), or ordering the minor to attend school or participate in a training program (Ill. Rev. Stat. 1987, ch. 37, par. 803—24(6) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 705—2(6))). The court may subsequently modify (Ill. Rev. Stat. 1987, ch. 37, par. 803—24(3) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 705—2(3))) or terminate (Ill. Rev. Stat. 1987, ch. 37, par. 803—32(2) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 705—11(2))) the dispositional order, if the minor's and the public's best interests so dictate. These extensive procedures reveal that the MRAI does not relieve the

State of its burden of proof regarding the minor's best interests.

The circuit court also found that the MRAI shifted the burden to the parents to show that authoritative intervention is not necessary and that the minor should be placed with them. As we have just discussed, however, the State must show that adjudging the minor a ward of the court and placing the minor outside the home is in the minor's best interests. Only after the State fulfills this burden must the parents then show why the minor should be returned home. Thus, the MRAI does not shift the burden of proof to the parents.

As its fourth objection, the circuit court contended that the MRAI denies parents a meaningful opportunity to be heard because the MRAI does not provide a procedure whereby the parents may petition the court to have their child returned to them. Parents, as well as any adult, may direct the filing of a petition, through the State's Attorney, which alleges that a minor requires authoritative intervention. (Ill. Rev. Stat. 1987, ch. 37, pars. 803—15(1), (2) (formerly Ill. Rev. Stat. 1985, ch. 37, pars. 704—1(1), (2)).) The MRAI, however, does not provide parents with a procedure whereby they can file a separate petition to oppose the minor's wardship. Nevertheless, the lack of such a procedure does not deprive parents of procedural due process. The parents are notified of the minor's whereabouts when the State takes the minor into custody. The parents are involved in the crisis intervention services and alternative placement. When a petition is filed, service of process is issued to the minor's legal guardian or custodian and to all of the respondents. (Ill. Rev. Stat. 1987, ch. 37, pars. 803—17, 803—18 (formerly Ill. Rev. Stat. 1985, ch. 37, pars. 704—3, 704—4).) Thus, the parents are notified of the court action, and as we pointed out earlier, the court must give the parents an opportunity to present their

views before the court decides whether to adjudge the minor a ward of the court. Even after the minor is adjudged a ward of the court, the court can still release the minor to his or her parents and place the minor under supervision. Because the parents are afforded all of these opportunities in the MRAI, parents are not denied due process simply because they cannot file a petition objecting to the proposed wardship.

The circuit court's final objection was that the MRAI does not contain appropriate standards to establish whether the minor should be returned home during the 21-day period. The standards are that the minor is absent from home without parental consent (or beyond the control of his or her parents and at risk of harm) and the minor refuses to return home. The circuit court stated that further standards are necessary in order to reduce the risk of erroneous deprivation of the parents' rights.

We conclude that the standards set forth in the MRAI do not violate due process. Those standards—absence from home and a refusal to return—only affect the child's custody for 21 days. As we have discussed, a court may not use these standards alone to adjudge the minor a minor requiring authoritative intervention or a ward of the court. Moreover, we have already found that the standards and procedures used to take the child into custody for 21 days, to adjudge the minor a minor requiring authoritative intervention, and to adjudge the minor a ward of the court are appropriate. Consequently, the risk of erroneous deprivation of the parents' rights is small. Although the legislature is free to establish more standards, we find that additional standards are unnecessary to uphold the constitutionality of the MRAI.

As we noted earlier, the governmental interest in the MRAI is a concern for the welfare of minors. The circuit court held that the MRAI does not address this interest.

For the reasons we have already outlined, we conclude that the MRAI does fulfill the State's interest.

Also of concern to the State are the fiscal and administrative burdens associated with the imposition of additional procedures. The circuit court stated that an immediate hearing would decrease the number of minors requiring State care because some minors would be immediately returned home. Under the MRAI now, however, some minors may never even come before the court because the parents, minor and State may resolve the problem during the 21-day period. Requiring an immediate hearing means that *all* minors taken into limited custody would come before the court. Thus, the burden on the court system would be great. The legislature specifically stated that it does not want court intervention until the State has made attempts to correct the minor's problem. (Ill. Rev. Stat. 1987, ch. 37, par. 801—4(b).) Moreover, a resolution reached by agreement of the minor and the parents is preferable and more effective than a court-ordered resolution. Thus, the burden of an immediate court hearing outweighs any benefit it would provide.

The circuit court also stated that the added burdens of (1) increasing the State's burden of proof, (2) allowing parents to refute the State's evidence, (3) increasing the MRAI standards, and (4) allowing parents to file a petition in opposition would be offset by a reduction in the number of cases where the State needed to intervene. We have pointed out, however, that some of these procedures are required by, and are adequate under, the MRAI. Any additional procedures would not necessarily decrease the number of intervention cases and would surely increase the administrative and fiscal burden on the State. Balancing the private interest, the risk of erroneous deprivation to that interest, and the governmen-

tal interest, we conclude that the MRAI does not violate procedural due process.

## VI. Void for Vagueness

The circuit court and B.R.'s mother next contend that the MRAI violates due process because it is void for vagueness. (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2.) Statutes are presumed valid and constitutional. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 499.) "A legislative enactment is unconstitutionally vague if its terms are so indefinite that 'persons of common intelligence must necessarily guess at its meaning and differ as to its application.' " (*Fagiano v. Police Board* (1983), 98 Ill. 2d 277, 282.) "A statute is unconstitutionally vague if its terms are so ill defined that their meaning will ultimately be determined by the opinions and whims of the trier of fact rather than any objective criteria." (*La Pointe*, 88 Ill. 2d at 499.) "[A] statute does not violate the due process clauses of the United States or Illinois constitutions, on grounds of vagueness, if the duty imposed by the statute is prescribed in terms definite enough to serve as a guide to those who must comply with it." (*Chastek v. Anderson* (1981), 83 Ill. 2d 502, 507.) "In addition to the language used, consideration is also given to the legislative objective and the evil the statute is designed to remedy." *La Pointe*, 88 Ill. 2d at 499.

The circuit court and B.R.'s mother principally contend that the MRAI is vague because it fails to define the risk of harm from which the minor needs protection, and because it does not specify what circumstances or parental conduct contribute to that harm, thus requiring State intervention. Runaway minors presumably are at risk of harm, however, because they have detached themselves from parental supervision and care. For the reasons we have enumerated earlier, parental conduct

does not, and need not, justify State interference. The State may intervene when the minor's behavior itself has put the minor's welfare at risk.

The circuit court and B.R.'s mother wish to, in effect, add criteria to the MRAI. We must determine, however, whether the MRAI, as written, is vague. A court cannot adjudicate a minor as one requiring authoritative intervention until the minor: (1) is absent from home without parental consent, or beyond the control of his or her parents in circumstances which pose physical danger to the minor; (2) is taken into limited custody; (3) refuses to return home; (4) is provided with crisis intervention services for 21 days; and (5) fails to agree with his or her parents on alternative placement. The MRAI terms and criteria make it sufficiently clear which minors fall under the MRAI. Thus, we conclude that the MRAI is not void for vagueness and therefore not violative of due process. See *J.M.*, 170 Ill. App. 3d at 561 ("we do not find the [MRAI] unconstitutional on the ground of vagueness").

## VII. Equal Protection

Finally, the circuit court and B.R.'s mother contend that the MRAI violates equal protection (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2). A statute violates equal protection if it indiscriminately treats one class of persons differently from another class of persons. (*Plyler v. Doe* (1982), 457 U.S. 202, 216, 72 L. Ed. 2d 786, 798, 102 S. Ct. 2382, 2394.) The standard of review is identical to that used for substantive due process. If the statute infringes upon a fundamental right, then the statute is subject to strict scrutiny. (*Plyler*, 457 U.S. at 216-17, 72 L. Ed. 2d at 798-99, 102 S. Ct. at 2394-95.) A statute will only survive strict scrutiny if it is necessary to promote a compelling State interest and is narrowly tailored to effectuate that State interest. (*Plyler*, 457 U.S. at 216-17, 72 L. Ed. 2d at 798-99, 102

S. Ct. at 2394-95.) We concluded earlier that parents' interest in the care and custody of their child is a fundamental right. Therefore, the MRAI is subject to strict scrutiny under the equal protection analysis.

The circuit court pointed out that parents accused of neglect or abuse receive immediate hearings (Ill. Rev. Stat. 1987, ch. 37, par. 802—9(1) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 703—5(2))), while parents under the MRAI, who have not caused harm to their child, must wait 21 days for a hearing. Because parents under the MRAI have done no wrong, according to the circuit court, we must presume they act in their child's best interest. The circuit court contended, therefore, that the MRAI is neither necessary to meet, nor narrowly tailored to protect, the State's interest in the welfare of minors.

We conclude, however, that the State achieves its purpose through the MRAI. Minors whose parents are accused of neglect or abuse are, in most cases, removed from the home. The State actually removes abused and neglected minors from their parents in order to protect the minors from the *parents'* action or inaction. Thus, the goal is not necessarily to reunite the family, at least not immediately.

On the other hand, under the MRAI the *minor's* act of running away from the home puts the minor in danger, outside parental protection. (See *J.M.*, 170 Ill. App. 3d at 562.) Under the MRAI, the State must seek to reunite the family or set up an alternative residence for the minor that the minor and parents agree upon. Parents are not denied access to their child. The MRAI gives the State, parent, and minor a limited opportunity (21 days) to resolve the matter outside the court system.

B.R.'s mother argues that parents of dependent and addicted minors are similarly situated with parents under the MRAI, but the former receive an immediate

hearing and the latter do not. B.R.'s mother points out that parents of a dependent or addicted minor do not cause harm to their child. Rather, the minor's own actions cause him or her harm, just as a minor under the MRAI causes himself or herself harm.

A dependent minor is one who does not have a parent, or does not receive proper care because of the mental or physical disability of his or her parent, or does not receive proper medical or remedial care through no fault or neglect of his or her parent, or has a parent who wishes to be relieved of his or her parental rights and responsibilities. (Ill. Rev. Stat. 1987, ch. 37, par. 802—4(1) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 702—5(1)).) An addicted minor is one who habitually uses drugs or alcohol so as to lose self-control or endanger public health and safety. (Ill. Rev. Stat. 1987, ch. 37, par. 804—3 (formerly Ill. Rev. Stat. 1985, ch. 37, par. 702—3.1); Ill. Rev. Stat. 1987, ch. 111½, pars. 6304.1, 6304.4.) Although the parents of a dependent minor may not be at "fault," the dependent minor is nevertheless not receiving proper care from the parents. The State can remove both dependent and addicted minors from their homes without the consent of the parents or the minor. (Ill. Rev. Stat. 1987, ch. 37, pars. 802—5(1), 804—4(1) (formerly Ill. Rev. Stat. 1985, ch. 37, par. 703—1(1)).) The State's goal is to provide care to dependent and addicted minors who are not receiving such care at home.

On the other hand, minors under the MRAI may be receiving proper care at home, but, by running away from home, refuse to accept such care. The State, therefore, provides shelter and care to a minor who refuses to accept his or her parents' shelter and care. Moreover, the 21-day period affords the parents and minor a chance to reconcile prior to court intervention. Dependent and addicted minors and their parents do not need

a reconciliation period. Consequently, parents under the MRAI are not similarly situated with, and thus may be treated differently from, other parents under the Act because of these differing circumstances. The MRAI, for these reasons, survives strict scrutiny and does not violate equal protection.

Accordingly, the MRAI does not violate the due process and equal protection clauses of the United States Constitution and Illinois Constitution. The decision of the circuit court is reversed and the cause is remanded to the circuit court of Du Page County for proceedings consistent with this opinion.

*Reversed and remanded.*

JUSTICE MILLER, dissenting:

I do not agree with the majority's conclusion that the statutory provisions challenged here are constitutional. Accordingly, I dissent from today's decision.

At issue in the present case are certain portions of the Juvenile Court Act of 1987 (Ill. Rev. Stat. 1987, ch. 37, pars. 801—1 through 807—1) applicable to minors requiring authoritative intervention (the MRAI provisions). Under section 3—3 of the Act, the MRAI designation includes "any minor under 18 years of age (1) who is (a) absent from home without consent of parent, guardian or custodian, or (b) beyond the control of his or her parent, guardian or custodian, in circumstances which constitute a substantial or immediate danger to the minor's physical safety ***." (Ill. Rev. Stat. 1987, ch. 37, par. 803—3.) Those aspects of the MRAI provisions challenged here authorize the police to take into limited custody a minor requiring authoritative intervention and to place the minor with a social service agency pending an adjudication under the statute. If the minor has not been taken into limited custody on any other occasion during the preceding year, no adjudication may be made for a

period of 21 days; shorter periods of time are provided in other cases. (Ill. Rev. Stat. 1987, ch. 37, par. 803—3.) The minor may not be returned against his wishes to his parent, guardian, or custodian before that time. The respondent minors in the instant proceedings absented themselves from home without parental consent and were taken into limited custody pursuant to statute. The circuit court of Du Page County invalidated on constitutional grounds the challenged portions of the statutory scheme.

A stronger argument for the constitutionality of the MRAI provisions involving absentee minors would be presented if the Juvenile Court Act were interpreted to require that such a minor be in circumstances constituting "a substantial or immediate danger to his physical safety." That was the construction of the statute adopted by the appellate court in *In re J.M.* (1988), 170 Ill. App. 3d 552, which upheld the provisions against constitutional challenge. I agree with the majority, however, that the "substantial or immediate danger" clause has no application to absentee minors and pertains only to minors who are beyond parental control.

That conclusion is readily apparent from an examination of the earliest version of the MRAI statute. As originally enacted, the MRAI definition included "any minor under 18 years of age (1) who is (a) a chronic or habitual truant as defined in section 26—2a of the School Code, or (b) absent from home without consent of parent, guardian or custodian, or (c) beyond the control of his or her parent, guardian or custodian, in circumstances which constitute a substantial or immediate danger to the minor's physical safety." (Ill. Rev. Stat., 1982 Supp., ch. 37, par. 702—3.) Under that provision, the "substantial or immediate danger" clause either applied to only the last group specified in the statutory definition, minors beyond parental control, or it applied to all three

groups, truants, absentee minors, and minors beyond parental control. Application of the clause to truants would not have seemed appropriate, however, and therefore its scope must have been limited to the third group specified, minors beyond parental control. The legislature later amended the provision, removing the category of truants from the MRAI definition. The syntactical structure of the MRAI provision has remained unchanged, however, and I would therefore conclude that the same construction appropriate to the original version of the statute should apply to the current version as well.

I do not believe that the MRAI provisions at issue here satisfy the demands of due process. The statutory scheme requires the authorities to maintain in temporary custody, for up to 21 days, a minor who has absented himself from home and who refuses to return home. No other criteria limit the operation of those provisions. There is no requirement that the child be in danger or that he be without food, shelter, or money. Indeed, no consideration may be given to the child's circumstances. Moreover, as long as the minor refuses to rejoin the family home during the 21-day period, any request by the parent for the child's return must be denied. The provisions at issue thus empower a minor to choose to remain outside the home, in the custody of the State, for three weeks, and grant to the minor a veto over any request by the parent for his return, regardless of the circumstances presented and whether or not the best interests of the minor would be served by his return home.

The State's substantial interest in the welfare of minors cannot be doubted. (*Lassiter v. Department of Social Services* (1981), 452 U.S. 18, 27, 68 L. Ed. 2d 640, 650, 101 S. Ct. 2153, 2160.) Equally clear, however, is the fundamental right of a parent in the custody and control of a minor child. (*Santosky v. Kramer* (1982), 455 U.S. 745, 753, 71 L. Ed. 2d 599, 606, 102 S. Ct.

1388, 1394-95; *Stanley v. Illinois* (1972), 405 U.S. 645, 651, 31 L. Ed. 2d 551, 558-59, 92 S. Ct. 1208, 1212-13; *Meyer v. Nebraska* (1923), 262 U.S. 390, 399, 67 L. Ed. 1042, 1045, 43 S. Ct. 625, 626.) Consistent with that fundamental family right is the recognition of parental authority over minors. (See *Bellotti v. Baird* (1979), 443 U.S. 622, 637-39, 61 L. Ed. 2d 797, 809-11, 99 S. Ct. 3035, 3045-46.) Indeed, it is normally assumed that a parent acts in the best interests of a minor child. See *Parham v. J.R.* (1979), 442 U.S. 584, 602, 61 L. Ed. 2d 101, 118, 99 S. Ct. 2493, 2504.

As the majority correctly recognizes, the statutory provisions at issue here cannot survive challenge on substantive due process grounds unless they are narrowly drawn and serve a compelling State interest. I do not believe that the statutory scheme can be said to satisfy that rigorous standard. By placing absent children beyond parental control for as long as 21 days and granting to a child the right to refuse to return home during that period, the MRAI provisions significantly disrupt the fundamental right of parents in the care and custody of their minor children and subordinate the parent's interest to the dictates of the minor. Application of the statute is triggered simply by a minor's absence from home without the consent of his parent, guardian, or custodian and his refusal to return home. No further criteria govern—there is no requirement that the minor be in danger or otherwise in need of care and, indeed, no consideration may be given to any other aspect of the minor's condition. The broad scope of the statutory scheme fails to serve the State's compelling interest in the safety and well-being of minors. In declining to find a violation of substantive due process, the majority simply assumes that every minor's actions in absenting himself from home without consent establish the need for intervention by the State in the manner mandated by the

MRAI provisions. Such an assumption is unwarranted. The State could not detain an absentee minor for 21 days against the wishes of both the parent and the child, in the absence of any evidence that the minor was in danger or otherwise in need of care; I do not believe that the minor's mere refusal to return home, without more, can validate the present statutory scheme.

I would also hold that the 21-day period in which a minor subject to the statute is allowed, at his option, to remain outside the family home violates the procedural due process rights of parents. Due process is a flexible concept, and there is no single formula having universal application. (*Mathews v. Eldridge* (1976), 424 U.S. 319, 334, 47 L. Ed. 2d 18, 33, 96 S. Ct. 893, 902.) A prompt adjudicatory hearing should be afforded, and I do not believe that the lengthy delay allowed by the statute can be said to provide parents with "the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Mathews*, 424 U.S. at 333, 47 L. Ed. 2d at 32, 96 S. Ct. at 902.

Runaway children often are at risk of serious physical and emotional harm, and efforts to make community resources available to meet the needs of such youths are to be commended. The present legislation, however, does not adequately recognize the legitimate interests of parents in the custody and control of their minor children. In sum, I would hold that the MRAI provisions at issue here are violative of the due process guarantees of the Federal and State Constitutions, and therefore I dissent from the majority's decision to the contrary.